THE STATE ex rel. J. L. SPILLERS, County Collector, Appellant, v. THOMAS A. JOHNSTON.

Division One, November 25, 1908.

1. TAXATION: Military School: Exemption. One acre of ground, within an incorporated city, on which is a private military boarding school, in which the proprietor resides with his family, having no occupation but running the school and in which his wife and children participate, is exempt from taxation under the Constitution and statute.

2. ———: Exemptions: Not Favored. Tax exemptions are in derogation of equal rights, and are not to be favored by the

courts, but are to be strictly construed, and confined to the subjects specified, including such as are necessarily within the contemplation of the legislation creating the exemption. But strict construction must nevertheless be a reasonable construction.

3. ———: ———: **Exclusive Educational Use: Incidental Use.** Where the Constitution and statute exempt from taxation real estate "used exclusively for schools," the words "exclusively used" have reference to the primary and inherent use as over against a mere secondary and incidental use, such as the residing in the school building by the proprietor and his family, who for the most part assist him in conducting the school. If such incidental use does not interrupt the exclusive occupation of the building for school purposes, but dovetails into or rounds out that use, then the use may be said to be an exclusive school use, and the property is exempt from taxation.

4. ———: ———: ———: ———: **Military Pay School.** A military pay school, where cadets are received and boarded, as are the officers and teachers, under a family arrangement, is exempt from taxation. To hold that its proprietor, charged with the primary duty of ideally developing the mind, manners and morals of his pupils, may reside in the school house, if he is unmarried and thus have the benefit of exemption from taxation on the property, but that he must lose the exemption if married and resides there with his wife and children, though they in a manner are merged in the school family, is to make the law absurd and harsh.

Appeal from Cooper Circuit Court.—*Hon. Samuel Davis,* Special Judge.

AFFIRMED.

*W. G. & G. T. Pendleton* for appellant.

The trial court erred in declaring as a matter of law that under the evidence relator was not entitled to recover, and in rendering its finding for defendant. The Constitution (art. 10, sec. 6), and the Revised Statutes of 1899 (sec. 9119), exempt from taxation lots in incorporated cities to the extent of one acre only from taxation when used exclusively for schools.

214 Sup.—42

"Where a building is used in part for a school house, and in part for other purposes, it is not exempt from taxation." Wyman v. St. Louis, 17 Mo. 335; St. Mary's College v. Crowl, 10 Kan. 442.

*John & J. W. Cosgrove* for respondent.

(1) The acre of land, with the building thereon, is exempt from the assessment sought to be enforced notwithstanding the fact that respondent's family, the professors, instructors and servants resided in the building situated on said acre. Blackman v. Houston, Tax Collector, 2 So. (La.) 193; Carter v. Patterson, 39 S. W. (Tex. Civ. App.) 1110; Ramsey County v. Macalester College, 53 N. W. (Minn.) 704; New Orleans v. Arthurs, 36 La. Ann. 98. (2) The word "exclusively" does not so qualify the use to which the property may be put as to take away its exemption because respondent permits his family and most of the teachers and officers to reside in and eat and lodge in the building. As the record shows that a portion of the house is occupied as a residence by plaintiff and his family, appellants argue that the property is not exempt from taxation, because it is thus shown that the same is not used exclusively for school purposes. The fallacy of the argument results from a too narrow construction of the article of the Constitution which exempts from taxation "all buildings and property used exclusively for colleges, or other school purposes."

LAMM, J.—By its suit in the Cooper Circuit Court (the Hon. Samuel Davis sitting as special judge), the State sought to recover taxes for the years 1900-1-3 on block 3, Houck's Addition to Boonville, excepting eighty-four feet off of the south side, aggregating all told in principal, penalties, interest and costs, $375.39.

The evidence being in, the court gave a peremptory instruction for defendant. From a judgment following, the State appeals.

No question is made on the petition. It is in conventional form.

Defendant answered confessing owning the land, but denied owing the taxes. For affirmative defense, he alleges that the land taxed consisted of one acre, was within the corporate limits of the city of Boonville, that it and the building thereon were used exclusively for school purposes by him during the years in suit, and, being so used, said acre was exempt from taxation under the Constitution and laws of the State of Missouri.

The reply put in issue the plea of exemption.

The case made on the facts is this:

Plaintiff put in a back taxbill, covering the years and parcel of ground, duly certified by Spillers, collector of the revenue for Cooper county, and rested.

Thereupon, to sustain his plea of exemption, defendant put in uncontradicted proof to the effect following: He is the proprietor of Kemper Military School in Boonville. Block 3 in Houck's Addition is more than an acre and he owned it all. Deducting eighty-four feet off of the south side, leaves the remainder one acre. He tendered and paid all taxes levied against the south eighty-four feet, upon which were located a barn and certain outbuildings of the school, and got acquittance therefor. The building known as Kemper Military School (a landmark in the history of Missouri) is on said acre. It was built years ago expressly for use as a private military boarding-school for boys, and such school has been kept there right along for many years by defendant since the death of its worthy founder. It accommodates 110 cadets, 10 officers, about 15 servants and defendant's family, made up of his wife, two daughters and two sons. Some of these children were minors, but attained their majority in the period covered. The school term is a little over nine months

per year. During the term the family, officers, and cadets resided in the school building except at intervals one or another of the children was away at school, and one for a little while clerked for a merchant. During vacations the officers do not reside in the building, but defendant and his family do and are engaged in getting ready for the next school term by advertising, correspondence, repairs, alterations, cleaning the building and otherwise. Mrs. Johnston has charge of what is known as the ''home department,'' *i. e.*, the boarding of the cadets, teachers and servants, attending to the health of the cadets, such duties as a good mother (an *alma mater* in name and fact) would perform for a family of boys. In the school building are eight or nine recitation rooms, a study hall, laboratory and fifteen or twenty rooms devoted to such general purposes as are necessary to the successful conduct of the school. While certain apartments of the building are set apart for the family, yet pupils and teachers have access to them and these apartments at times are used in connection with the school, *e. g.*, social attractions and giving the boys recreation. One of the defendant's said sons was an officer in the school and did school work. One of said daughters was the general assistant to her mother in the home department. Another son and daughter were minors and when they were not elsewhere at school or in the employ of outside parties in outside pursuits, they were merely members of defendant's family, except that, as said, during vacation all the family performed duties connected with the school in renovating, refurnishing, house-cleaning, etc., and presumably, in correspondence, advertising, etc.

Resting on the foregoing facts, learned counsel insist on one side and deny on the other that the *locus* to the extent of one acre is exempt from taxa-

tion under the following constitutional and statutory provisions:

(1)   Section 6, article 10, of the Constitution: ". . Lots in incorporated cities or towns, or within one mile of the limits of any such city or town, to the extent of one acre, and lots one mile or more distant from such cities or towns, to the extent of five acres, with the buildings thereon, may be exempted from taxation, when the same are used exclusively for religious worship, for schools, or for purposes purely charitable."

(2)   Section 9119, Revised Statutes 1899: "The following subjects are exempt from taxation: . . . .; *Sixth,* lots in incorporated cities or towns, or within one mile of the limits of any such city or town, to the extent of one acre, and lots one mile or more distant from such cities or towns, to the extent of five acres, with the buildings thereon, when the same are used exclusively for religious worship, for schools or for purposes purely charitable, shall be exempted from taxation, for State, county or local purposes."

It is not contended by counsel for the State, as we see it, that the exemption does not cover private schools as distinguished from public schools, nor pay schools as distinguished from free schools, nor boarding schools as distinguished from schools having no home department, nor military schools as distinguished from those having no military features. The contention of the State hinges on the phrase, "used exclusively," found in the tax-exempting clause of the Constitution and statute; and the point for decision is narrowed down to a simple question, which may be stated bluntly and singly to be: If the proprietor of a private military boarding school in Missouri reside in the school building with his family, having no avocation but running the school and in which avoca-

tion the family participate, does such residence destroy the exemption?

It is our opinion that viewed from the philosophy of the thing and measured by cardinal standards of legal interpretation, the right answer to that question is, No. This because:

(a) It must be conceded to the State that, whether a tax-exempting clause be viewed from the standpoint of the State down to the people or from the standpoint of the people up to the State, there be unbending and inviolate rules which as sure words of the law are always to be reckoned with; and those rules (from the standpoint of the State) are that an abandonment of the sovereign right to exercise the vital power of taxation can never be presumed. The intention to abandon must appear in the most clear and unequivocal terms (Railroad v. Cass County, 53 Mo. 1. c. 27); and from the standpoint of the people they are that equality is equity in taxation. That the yoke of taxation—a forced contribution for governmental needs—should rest evenly on the necks of all citizens. That to relieve one but increases the burden of the other. That tax exemptions are in derogation of equal right—are contrary to common right—hence, are not to be favored by the courts, but should be construed strictly and confined to the subjects specified including such as are necessarily within the contemplation of the legislation under review. [Kansas City Exposition Driving Park Co. v. Kansas City, 174 Mo. 425; Fitterer v. Crawford, 157 Mo. 1. c. 58, *et seq.;* City of Kansas v. Kansas City Medical College, 111 Mo. 1. c. 146.]

Says Scott, J., in Wyman v. St. Louis, 17 Mo. 335: "Equality is equity, and when one claims exemption from a burden to which all others are subject, and whose freedom will increase their load, he must

clearly show himself in the situation which entitles him to the exemption claimed."

And Cooley states the sum of the matter to be [1 Cooley on Taxation (3 Ed.), 357-8]: "It is also a very just rule that, when an exemption is found to exist, it shall not be enlarged by construction. On the contrary it ought to receive a strict construction; for the reasonable presumption is that the State has granted in express terms all it intended to grant at all, and that unless the privilege is limited to the very terms of the statute the favor would be extended beyond what was meant."

Nevertheless, conceding to the State the foregoing general propositions, yet strict construction must still be a reasonable construction, the product of right and clear thinking, or else reason is no longer the life of the law; and it has been well said by a scholar in jurisprudence that: "The utmost extremity of the law is injustice" (*i. e.*), "Straining the cords of the law in *some* cases to their greatest length will produce as much oppression as if there was no law at all" (*Apices juris non sunt jus*).

(b) The phrase "exclusively used" has reference to the primary and inherent use as over against a mere secondary and incidental use. [People ex rel. v. Lawler, 77 N. Y. Supp. 1. c. 842, *et seq.*] If the incidental use (in this instance residing in the building) does not interrupt the exclusive occupation of the building for school purposes, but dovetails into or rounds out those purposes, then there could fairly be said to be left an exclusive use in the school on which the law lays hold. [First Unitarian Society v. Hartford, 66 Conn. 1. c. 375.]

To illustrate: In the State of New York the following law was on the statute book:

"The real property of a corporation or association organized exclusively for the moral or mental im-

provement of men or women, or for religious, bible, tract, charitable, benevolent, missionary . . . or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes . . . shall be exempt from taxation.''

In a case (People ex rel. Church of St. Mary, the Virgin, v. Feitner *et al.*, Comrs. of Taxes, 168 N. Y. 494), the facts held in judgment were that certain real property consisting of a large church building devoted to religious services was concededly exempt, but there was a mission house, a clergy house and a rectory adjacent and the tax controversy arose over them. Referring to the mission house and the clergy house, that court said:

''The first controversy arises with reference to the mission house adjoining the southeast corner of the church. Upon the first floor of this house is a chapel, where there is an altar used daily for religious services. This building is in charge of three sisters, who have a general reception room upon the first floor, where all persons desiring to consult them are received. The second floor is also occupied by a chapel and the third floor by the women's guild, the rooms being used regularly three times each week, one for the mothers' meeting, one for the guild girls and one for younger girls and children. The fourth floor is used as the living rooms of the sisters, and the fifth is their kitchen. It appears that the work of the sisters is mainly carried on by the guilds organized for the purpose of doing charitable and missionary work in connection with the church among the poor, and the furnishing of the destitute with food and clothing, looking after them when they are sick, and inducing them to attend the meetings of the guilds, with the ultimate object of making them members of the church. The daily use of the chapel for religious services, the constant reception of women and children for counsel and advice,

the distribution of charity, with the meeting of the guilds day and night, would seem to make the residence of the sisters in the building necessary and an incident to the work carried on there, and not an appropriation of the building for other purposes than that for which the relator was incorporated. We are, therefore, inclined to the view that this building is exempt.

"The clergy house adjoins the southwest corner of the church building. The first floor consists of a large room known as the St. Joseph's Hall, used for a Sunday school and other religious services. It is connected with the church and can be utilized as a part of the seating capacity of the church when it is overcrowded. In this building is also located the choir and vestry. The choir boys assemble here before services and put on their vestments. The chapel of the church proper extends to and occupies the second floor for a gallery. The third floor is used for the men's guild, and consists of a reading room, club room, a billiard room and library. This building is under the care of three curates, who conduct devotional exercises in the chapels and at the guilds. They counsel and advise applicants, and assist in carrying on the work of the church. The fourth floor is occupied by them for sleeping and living rooms, and the fifth floor is occupied by the engineer, who has charge of the heating and the mechanical apparatus of the entire buildings. We incline to the view that the occupation of this building by the curates and engineer is incidental to the work carried on by the corporation, and that it is also exempt."

To the same effect and more nearly in point on the facts is Blackman v. Houston, Tax Collector, 39 La. Ann. 592. In that case Poche, J., said: "It stands to reason that a college, with some two or three hundred scholars, who would also be boarders, would

not lose its character as being used exclusively for school purposes, because, forsooth, it would contain rooms for the accommodation of necessary teachers, as well as for the servants required for the preparation of the food of teachers, as well as of scholars, and for the performance of other household duties. It is too plain in our minds for argument that all these incidents are necessary adjuncts to property used exclusively for college purposes. It would certainly be imprudent, if not dangerous, to leave unoccupied at night, or when classes are not being actually taught, a building used for school purposes in a large city; and the argument which would hold that the occupation of such building by a janitor and his family would destroy or even impair its character as being used exclusively for school purposes, would doubtless find no sanction under the true meaning of the article of the Constitution, or even in reason and common sense. Is it entitled to more consideration or to greater weight when applied to the owner of the building, who is the principal and one of the teachers of the school kept therein? This court has held that the right of exemption from taxation [as the manufacturer] of a 'textile fabric' was not affected or impaired by the fact that the owner occupied the same building with his family as a residence. [City of New Orleans v. Arthurs, 36 La. Ann. 98.]''

In Carter v. Patterson, 39 S. W. (Tex.) 1110, it was said (quoting the syllabus): ''A building used as a boarding school is not deprived of its exemption from taxation as a building used exclusively for school purposes by the fact that the owner and his wife, who were both teachers in the school, resided in the building, and that he permitted the use thereof on several occasions for entertainments, charging no more than the expense of the lights and the arrangement of the furniture.'' [See, also, North St. Louis Gym-

nastic Society v. Hudson, 12 Mo. App. 342; State *ex rel.* v. Powers, 10 Mo. App. 263. And (*arguendo*) Bishop's Residence Co. v. Hudson, 91 Mo. 671.]

The foregoing cases illustrate that, in getting at the meaning of the constitutional and statutory exemption, courts while applying the rules of strict construction yet take the road the guide-post of common sense points.

(c)   If the Constitution or statute had excluded from tax exemption pay private schools or military boarding schools, another case would be here. But as the language of the exemption undeniably includes boarding schools, we must take such schools as we find them and as the Constitution-makers in 1875 found them and as the Legislature enacting the law carrying out the constitutional power of exemption found them. In this view, to keep a private boarding school means to have a family arrangement for pupils and head-masters. A family arrangement means, practically, a family association under a common roof, by a common fireside, in a common lodging and at a common table—all mere incidents to such school use. To hold that the proprietor of such school, charged with the primary duty of ideally developing the mind, manners and morals of his pupils, may reside in the school house if he is unmarried and thus have the benefit of the exemption, and may lose it if he is married and reside there, or to hold that if married his wife and children must be banished though his family be in a manner merged in the school family, is to make the law absurd and harsh. Such construction is to be avoided. [Keeney v. McVoy, 206 Mo. 42.]

No man (who, sometime as a wholesome boy, poring over the pages of Tom Brown At Rugby, glowed with delight) need be told that a boys' private school, alive with the uplifting influences of an ideal family arrangement, *mater* and *pater familias* included, is

within the pale and reason of general provisions of law exempting school property from taxation.. To such a man, the thing speaks for itself; and to such a man, as a judge on the bench, it is put beyond argument. No patriotic citizen who in sober reflection must realize that if a free self-governing people would escape the evils of an overpowering standing army, it must rest its protection upon the sensible military ardor and training of its youth, need be told that a military pay school is within the reason and the pale of general provisions of law fostering schools.

(d)    In interpreting the phrase, "used exclusively," commonly found in constitutional and statutory tax-exempting provisions, it has uniformly been held that if certain parts of the school building be rented for stores or other income purposes, not merely incidental to the school itself, it destroys the exemption. To that class of cases the two relied on by appellant [Wyman v. St. Louis, 17 Mo. 335; St. Mary's College v. Crowl, 10 Kan. 442] must be assigned. Many others of similar import might be cited [Fitterer v. Crawford, *supra;* Cincinnati College v. State, 19 Ohio 110; People ex rel. v. Y. M. C. A., 157 Ill. 403; United Brethren v. Commissioners, 115 N. C. 489]. But such cases are not this case.

Courts have been astute to see to it that the exemption be not enlarged by construction beyond necessary implications. Indeed, cases may be found that deny the exemption where the owner of the school uses the school building as a residence for himself and family. [Red v. Johnson, 53 Tex. 284.] In another Texas case (Edmonds v. San Antonio, 14 Tex. Civ. App. 155), the exemption was denied where a practicing attorney owned a building, resided in it and his wife kept the school. But that case recognizes the justness of our holding here; for it was there said: "If appellant had been a teacher in the school, and had no other

profession, the property might have been exempt from taxation; but when there is appended to the teaching the practice of law, or to the practice of law the teaching of children is appended, the premises were not used exclusively for school purposes." [See, in this connection, Red v. Morris, 72 Tex. 554, and Cassiano v. Ursuline Academy, 64 Tex. 673.]

The premises considered, we are of opinion the judgment should be affirmed. It is so ordered. All concur.